IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION FOR A WARRANT AUTHORIZING THE INSTALLATION AND MONITORING OF A TRACKING DEVICE IN OR ON A 2006 GREY HONDA CRV, VIN SHSRD78826U444143, NH REG 4535105 | Case No. 19-mj-212-01-AJ<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Task Force Officer Kevin Rutina, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I also am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

2. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117 to authorize the installation and monitoring of a tracking device in or on the following vehicle: a 2006 Grey Honda CRV, with vehicle identification number SHSRD78826U444143, New Hampshire registration 4535105, registered to Simon Sepulveda Saez, 502 Spruce Street #3, Manchester, New Hampshire (the "Subject Vehicle") believed to be used by a drug

1

trafficker known as "Laurey." Based on the facts set forth in this affidavit, I believe that the Subject Vehicle is being used by Laurey in furtherance of violating Title 21, United States Code, Sections 841(a)(1)(distribution of controlled substances) and 846 (conspiracy to distribute controlled substances) and that there is probable cause to believe that the installation of a tracking device in or on the Subject Vehicle and use of the tracking device will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

       3.      I am a Trooper First Class with the New Hampshire State Police Narcotics Investigations Unit assigned as a Drug Enforcement Administration ("DEA") Task Force Officer with the Southern New Hampshire DEA High Intensity Drug Trafficking Area Task Force in the Manchester District Office and have been so assigned since March of 2019. I have been employed by the New Hampshire State Police since February of 2008. My duties and responsibilities include the investigation of federal crimes, including violations of 21 U.S.C. §§ 841(a)(1) and 846. I have participated in numerous investigations relating to the distribution of controlled substances, including cocaine, heroin, fentanyl, and other substances. I have received significant training in the field of narcotics enforcement and investigations. Through my training, education, and experience, I have become familiar with the manner in which drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of

persons involved in such activity to avoid detection by law enforcement.[1] In the course of participating in investigations of drug distribution organizations, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search warrants, debriefings of subjects, witnesses, and confidential informants, and reviews of consensually recorded conversations, meetings, and Title III intercepts.

    4.    Based upon my training, experience, and involvement in prior investigations, I know that individuals who distribute drugs often utilize motor vehicles in order to obtain quantities of controlled substances from their source of supply for distribution. I also know that individuals who are engaged in the distribution of controlled substances utilize motor vehicles in order to transport controlled substances to various locations in order to meet with and distribute controlled substances to prospective purchasers. They also use motor vehicles to transport drug proceeds to and/or from their illicit transactions, as well as to and/or from locations where these proceeds may be counted and stored. Because individuals who are involved in the distribution of controlled substances are highly cognizant of the presence of law enforcement, and often engage in counter-surveillance maneuvers while traveling in a motor vehicle, it is frequently difficult for law enforcement officers to effectively conduct surveillance. The presence of a tracking device on a motor vehicle which is being utilized for the distribution of controlled substances or the transportation of drug proceeds is beneficial

---

[1] Observations made and conclusions drawn throughout this affidavit that are based on my training and experience also include the training and experience of other law enforcement agents and officers with whom I have discussed these issues.

because it allows law enforcement officers to track the movement of the vehicle effectively and to decrease the chance of detection.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. In preparing this affidavit, I have prepared reports and reviewed reports prepared by other investigators of witness interviews, surveillance, and other investigative efforts regarding this investigation. In addition, I have discussed this investigation with other officers involved in the case. Through these conversations and my own analysis of these reports, I am familiar with all aspects of this investigation. The information contained in this affidavit is submitted for the sole purpose of supplying probable cause for the issuance of an order authorizing the government, at any hour of the day or night, to install, monitor, maintain, and remove a mobile tracking device which transmits an electronic signal that can be used to detect the movement and location of the above described Subject Vehicle, and make surreptitious entry into the vehicle at any hour of the day or night to install the mobile tracking device, maintain the mobile tracking device, or remove the mobile tracking device. This affidavit does not set forth all of my knowledge about this investigation.

## PROBABLE CAUSE

6. The affidavit is based, in part, on information provided by a confidential human source ("CHS"). CHS provided information to the Manchester Police Department ("MPD") about a drug trafficker named "Laurey" working in the Manchester, New Hampshire area. CHS originally began cooperating with the MPD after being arrested on charges related to drug distribution. Specifically, the MPD conducted controlled purchases of heroin or fentanyl from

the CHS, totaling over 100 grams.[2] CHS is facing charges for those sales and is cooperating in hopes of receiving consideration with respect to those pending criminal charges. He/she has not yet been provided with any consideration for those charges. CHS has multiple convictions including for Stalking, Disorderly Conduct, Criminal Mischief, Criminal Threatening, and Simple Assault. Since CHS began cooperating, other officers and I have corroborated CHS's information through surveillance and other sources and have found it to be reliable. In addition, I am aware that CHS cooperated with another law enforcement agency in the past and was found to be reliable. It was not until after his/her cooperation ended, that law enforcement officers became aware that he/she was selling drugs again, and began the investigation that led to his/her current pending charges.

7. After CHS's arrest, CHS told officers about a drug trafficker known as "Laurey" who he/she has known for four years. He/she bought drugs that he/she re-sold to others from Laurey and also had a social relationship with him. According to CHS, Laurey runs a drug business in Manchester and sells large quantities of heroin or fentanyl. CHS does not know where Laurey lives, but believes he may reside in the City of Manchester because when CHS orders drugs to be delivered to Manchester, Laurey typically delivers it within 25 minutes. CHS said that Laurey drives two vehicles, a silver older model Honda CR-V with a vehicle hide, used to store drugs located in the center console area (the Subject Vehicle), and a newer black Honda

---

[2] We have not received lab results for any of the drugs discussed in this affidavit. I believe, based on my training and experience, that the drugs are consistent with heroin or fentanyl, based on their color, packaging, texture, and consistency.

CR-V with a hide located in the front passenger seat.[3] CHS said that both vehicles had New Hampshire plates and Laurey drove both vehicles regularly to deliver drugs. CHS said that he/she knew that Laurey was not the registered owner of the vehicles. CHS said he/she believed that Laurey and his associates pay a person to register the vehicles for them.

8.  CHS said Laurey would deliver between 100 and 300 grams of heroin or fentanyl at a time. CHS said that he believed he/she had seen as much as two kilograms of heroin or fentanyl inside the aftermarket hide in the Subject Vehicle. CHS said that Laurey delivered the drugs alone and rarely had anyone else with him. CHS explained that Laurey could be contacted at any time and was usually always available to make a delivery. CHS bought drugs from Laurey as recently as October 2019.

9.  On October 10, 2019, the MPD instructed CHS to conduct a controlled drug buy from Laurey. CHS placed a phone call to Laurey, in the presence of MPD officers, and requested to purchase 12 "fingers" (approximately 120 grams) of heroin/fentanyl. CHS explained that in addition to paying for those drugs, he/she would also have to pay Laurey $400 owed from a previous drug debt. In addition, CHS explained that when CHS ordered 12 fingers, Laurey would "front" him an additional six fingers. CHS therefore expected to receive 18 fingers even though he/she ordered 12. MPD officers searched CHS and his/her vehicle for money or contraband, provided CHS with MPD recorded currency, and outfitted CHS with a recording device. They kept CHS under surveillance as CHS went to meet Laurey. At the designated meet location, officers

---

[3] The CS originally stated that these vehicles were Civics, but later corrected himself to identify the vehicles as CR-Vs.

observed the Subject Vehicle arrive. They then observed CHS get out of his/her vehicle and enter the Subject Vehicle for approximately 3-4 minutes. They then observed CHS exit the car and the Subject Vehicle drove away. Officers surveilled CHS to a designated meeting location where CHS turned over approximately 180 grams of a mixture and substance that MPD officers believed, based on their training and experience, to contain heroin or fentanyl. CHS said that when he/she entered the Subject Vehicle, Laurey used the windshield wiper switch to open the "hide" which was located in the dash board above the center console. CHS said that Laurey took the drugs out of the hide and placed the CHS's cash inside the hide. CHS said he/she observed other packages of drugs in the hide as well. CHS took a photo of the hide and provided it to MPD officers. CHS and his/her vehicle were searched after the purchase with negative results.

10. On October 15, 2019, the MPD instructed CHS to conduct a second controlled buy from Laurey. CHS placed another order for approximately 120 grams of heroin/fentanyl from Laurey. Again, MPD officers searched CHS and his/her vehicle for money or contraband, provided CHS with MPD recorded currency, and outfitted CHS with a recording device. They kept CHS under surveillance whenever possible as CHS went to meet Laurey. Although Laurey was not immediately available, the controlled purchased happened a few hours after the initial order. Officers observed the CHS travel to the designated meeting location. They then observed the Subject Vehicle arrive and watched as CHS got out of his/her vehicle and entered the Subject Vehicle. Approximately 1-2 minutes later, CHS exited the Subject Vehicle and returned to his/her vehicle. CHS then drove to meet MPD officers at the predetermined meeting location and turned over approximately 180 grams of a substance containing what MPD officers

believed, based on their training and experience, to be heroin/fentanyl. Again, per their previous agreement, Laurey gave CHS an extra approximately 60 grams. CHS explained that when he/she was in the car, Laurey again took the drugs out of the hide in the dashboard above the center console. Again, CHS observed various other bags of drugs inside the hide. CHS and his/her vehicle were searched after the purchase with negative results.

11.     Later that night, CHS contacted officers and told them that Laurey had called him/her and was planning to come by CHS's house to give him/her something. Officers instructed CHS to tell Laurey that he/she was unavailable and conducted surveillance of CHS's house. They observed the Subject Vehicle arrive outside CHS's residence. They then observed the driver of the Subject Vehicle enter the residence for approximately 30 seconds and then come back out. According to CHS, he/she told Laurey that he/she was unavailable and Laurey said that he would leave something for CHS in the dryer, located in a common area of the residence. CHS went down to the dryer after the Subject Vehicle left and found a finger, approximately ten grams, of heroin/fentanyl. CHS then brought the drugs to law enforcement officers. CHS did not know why Laurey brought him/her the extra drugs. Officers suspect it may be because Laurey kept CHS waiting earlier in the day when CHS ordered the larger quantity of drugs.

12.     Officers have observed the Subject Vehicle parked at a residence on Country Club drive in Manchester, New Hampshire various nights over the past few weeks and believe that Laurey may reside there. A tracking device on the Subject Vehicle will expand the limited capabilities of this investigation and will be valuable in allowing

investigators to effectively follow the movement of Laurey at all times, to include times when physical surveillance is not possible or practical, while decreasing the chance of detection. This affiant and other involved investigators intend to utilize this information to assist with the possible interdiction of future drug deliveries, as well as to assist in identifying sources of supply, customers, drug and/or currency stash locations, and locating other evidence that will assist in learning the full nature and scope of Laurey's criminal activities.

13. In order to track the movement of the Subject Vehicle effectively and to decrease the chance of detection, I seek authorization to place a tracking device in or on the Subject Vehicle while it is in the District of New Hampshire. Because Laurey sometimes parks the Subject Vehicle in driveways and on other private property, it may be necessary to enter onto private property and/or move the Subject Vehicle to effect the installation, repair, replacement, and removal of the tracking device. Specifically, I seek authority to enter onto the premises of 4 Country Club Drive, Manchester, New Hampshire, to install the device as the vehicle has been parked in the parking lot of that residence. To ensure the safety of the executing officer(s) and to avoid premature disclosure of the investigation, it is requested that the court authorize installation, maintenance, and removal of the tracking device during both daytime and nighttime hours. The Subject Vehicle will be highly visible during daytime hours. Therefore, it is hereby requested that the Honorable Court allow for law enforcement officers to install the tracking device at any time in the day or night.

14. In the event the Court grants this application, there will be periodic monitoring of the tracking device during both daytime and nighttime hours for a period

not to exceed 45 days following issuance of the warrant. Because Laurey may sometimes park the Subject Vehicle on private property, this application also requests authority to make covert entry, without approval or knowledge of the owner, custodian, or occupants onto private property, if necessary, being the driveway, land, and curtilage of 4 Country Club Drive, Manchester, New Hampshire. This application also requests authority to make covert entry into, or possibly move, without approval or knowledge of the owner, custodian, or user, the Subject Vehicle, if necessary, to effect the same. The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

## AUTHORIZATION REQUEST

15. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117, that authorizes members of the DEA, the MPD, or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to install a tracking device in or on the Subject Vehicle within the District of New Hampshire within 10 days of the issuance of the proposed warrant, to maintain, repair, and/or replace the tracking device as necessary, and to remove the tracking device from the Subject Vehicle after the use of the tracking device has ended; to install, maintain, and remove the tracking device during both daytime and nighttime hours; and, if necessary, to surreptitiously enter the resident parking areas of the locations specified herein to effect the installation, repair, replacement, and removal of the tracking device; and to monitor the tracking device for a period of 45 days following the issuance of the warrant, including when the tracking device is inside private garages and other

locations not open to the public or visual surveillance, both within and outside the District of New Hampshire.

16. In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I further request that the warrant delay notification of the execution of the warrant for 30 days after the end of the authorized period of tracking (including any extensions thereof) because there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior.

    Respectfully Submitted,

    /s/ Kevin Rutina
    Kevin Rutina
    Task Force Officer
    Drug Enforcement Administration

Subscribed and sworn to before me on October 22, 2019.

DANIEL J. LYNCH
UNITED STATES MAGISTRATE JUDGE